**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re:<br><br>JAMES E. CRAIG AND KELLY A.<br>SULLIVAN-CRAIG<br><br>          Debtors | Chapter 13<br>Case No. 17-12373-MSH |

**MEMORANDUM OF DECISION AND ORDER ON CONFIRMATION OF THE DEBTORS' CHAPTER 13 PLAN DATED JULY 28, 2017**

James Craig and Kelly Sullivan-Craig, the debtors in this case, filed a chapter 13 plan dated July 28, 2017 that, among other things, proposes (i) to cure all pre-petition payment arrearages owed to their first mortgage lender, Ditech Financial, LLC by making monthly payments to Ditech over the five year term of the plan, while maintaining their current payments to Ditech outside the plan, (ii) to treat their second mortgage obligation to Webster Bank as entirely unsecured and (iii) to pay their unsecured creditors, including Webster Bank, nothing.

Dissatisfied with the treatment of its claim, Webster Bank objected to confirmation of the Craigs' plan thereby initiating a contested matter under Fed. R. Bankr. P. 9014. I conducted an evidentiary hearing on the contested matter, and the following shall constitute my findings of fact and rulings of law pursuant to Fed. R. Bankr. P. 7052.

The Craigs take the position that the amount of their outstanding obligation to Ditech, $399,958.69, exceeds the $370,000 fair market value of their home at 116 Vincent Road in Dedham, Massachusetts (the "Property"), which secures that obligation. Thus they claim there is no residual home value to support Webster Bank's second mortgage claim of $71,983.46, making Webster Bank a mere unsecured creditor in this chapter 13 case.

In *Nobelman v. American Savings Bank*, 508 U.S. 324 (1993), the Supreme Court of the United States ruled that Bankruptcy Code § 1322(b)(2), which prohibits the modification of certain home mortgage claims in chapter 13 plans, prevents the bifurcation of such claims under Code § 506(a) into secured and unsecured components based on the value of the home (so-called "lien strip-downs"). *Nobelman* did not address directly whether § 1322(b)(2) also prevents "lien strip-offs," that is, treating a home mortgage claim as wholly unsecured when the value of the home does not exceed the amount of liens senior to the one being stripped. In the First Circuit, those courts that have addressed the issue all read *Nobelman* narrowly to apply to strip-downs only, permitting strip-offs in chapter 13 plans such as the treatment of Webster Bank's claim by the Craigs. *See Domestic Bank v. Mann (In re Mann)*, 249 B.R. 831 (B.A.P. 1st Cir. 2000); *TD Bank, N.A. v. Landry*, 479 B.R. 1, 4 (D. Mass. 2012); *In re Hernandez Diaz*, 544 B.R. 471 (Bankr. D.P.R. 2016).[1]

---

[1] All of the courts of appeals to have considered this issue agree that *Nobelman* prohibits strip-downs but not strip-offs. *Minnesota Hsg. Fin. Agency v. Schmidt (In re Schmidt)*, 765 F.3d 877, 881 (8th Cir. 2014); *Branigan v. Davis (In re Davis),* 716 F.3d 331, 335 (4th Cir. 2013); *Zimmer v. PBS Lending Corp.(In re Zimmer),* 313 F.3d 1220, 1226 (9th Cir. 2002); *Lane v. Western Interstate Bancorp (In re Lane),* 280 F.3d 663, 667–69 (6th Cir. 2002); *Pond v. Farm Specialist Realty (In re Pond),* 252 F.3d 122, 126 (2d Cir. 2001); *Tanner v. FirstPlus Financial, Inc. (In re Tanner),* 217 F.3d 1357, 1360 (11th Cir. 2000);   *Bartee v. Tara Colony Homeowners Ass'n (In re Bartee),* 212 F.3d 277, 295 (5th Cir. 2000); *McDonald v. Master Financial, Inc. (In re McDonald),* 205 F.3d 606, 611 (3d Cir. 2000). In *American Gen. Fin. V. Dickerson (In re Dickerson)*, 222 F.3d 924, 926 (11th Cir. 2000), while the panel upheld the bankruptcy court's confirmation of a strip-off chapter 13 plan, it did so because it felt bound by its prior ruling in *Tanner*, noting that but for *Tanner*, it would apply *Nobelman* to prohibit strip-offs as well as strip-downs. *But see Woolsey v. Citibank, N.A. (In re Woolsey)*, 696 F.3d 1266, 1279 (10th Cir. 2012) (holding lien stripping of wholly unsecured junior lien could not be accomplished under § 506(d), the only section the debtors argued was applicable to lien stripping in chapter 13, but leaving open issue of whether § 1322(b)(2), referred to by the court as "a promising candidate," would permit a strip off). Lower courts in the Tenth Circuit have permitted strip offs under § 1322(b)(2). *See, e.g., McPherson v. Green Tree Servicing, LLC (In re McPherson)*, No. 13-cv-00436-RBJ, 2013 WL 6657599, at *4 (D. Colo. Dec. 17, 2013) (concluding that a wholly

While Webster Bank does not take issue with the Craigs' legal analysis, it disagrees with their position that the Property has a fair market value of $370,000. In its objection to confirmation of the Craigs' plan, Webster Bank asserts that the Property has a fair market value of $465,000. Webster Bank maintains that based on *Nobelman*, in a chapter 13 case, as long as there is one dollar of value in a debtor's principal residence securing a claim of a creditor with no other collateral, a confirmable plan may not modify that claim. Thus if the value of the Property exceeds Ditech's $399,958.69 claim by even a dollar, the Craigs would be required to propose a plan that treats Webster Bank's claim as fully secured.

At the evidentiary hearing on this matter the parties presented evidence of the fair market value of the Property. Each party introduced into evidence a written affidavit accompanied by the appraisal report of its appraiser-- Resa Altsher for Webster Bank and Timothy McDonough for the Craigs. The bank's appraisal came in at $490,000 while the Craigs' appraisal presented a value of $368,000. After qualifying the appraisers as experts, I accepted their affidavits and appraisals as their direct testimony, allowing court testimony to begin with cross-examination.

In calculating the Property's fair market value, each appraiser used the sales comparison approach to value by identifying recent sales of comparable properties and adjusting the selling prices up or down to create an "apples to apples" comparison . Interestingly, out of a combined total for both appraisals of 9 comparable sales analyzed (five by Ms. Altsher for the bank and

---

unsecured junior lien could have been stripped if debtors had filed a contemporaneous motion to strip the lien as they represented in their plan that they had done, but seeking to strip the lien two years after confirmation was too late); *In re Garn*, 13-21907, 2013 WL 5723746 (Bankr. C.D. Utah Oct. 21, 2013).

four for Mr. McDonough for the Craigs), the appraisers shared not a single comparable in common. Their value opinions could not have been more divergent.

After carefully reviewing both appraisal reports in light of each appraiser's testimony, I find that Mr. McDonough's appraisal is less reliable than Ms. Altsher's. First, Mr. McDonough testified that unlike Ms. Altsher he did not consider lot size in determining the Property's fair market value. As a result he did not adjust for lot size when analyzing the comparable properties considered by him in his appraisal. Three out of the four comparables used by Mr. McDonough were on much smaller lots than the Property. The Property occupies an 11,280 square foot lot while the first three of Mr. McDonough's comparables involved lot sizes between 4980 and 8146 square feet. The fourth, 22 Glancy Lane, consisted of a comparably sized lot (10,574 square feet), but was located 2.36 miles away from the Property, a distance Mr. McDonough conceded on cross examination cut against comparability, but because it, like the Property, enjoyed an in-ground swimming pool, he decided to include it anyway. I find that lot size matters in determining a home's fair market value, and Mr. McDonough's failure to take this factor into account renders his appraisal less reliable than Ms. Altsher's.

Further diminishing the reliability of Mr. McDonough's appraisal was his assumption that the Property consisted of 8 rooms (excluding the basement) when in fact it has only seven rooms. This fundamental error calls into question not merely the adjustments made by Mr. McDonough to the comparable sales relied upon by him but the overall reliability of any of the data upon which his appraisal report is based.

I find that Ms. Altsher, the bank's appraiser, employed more reasonable and reliable valuation techniques. In her appraisal, one of the comparable sales she relied upon was of the

4

property at 127 Vincent Road. I find this property to be the most comparable to the Property of any of the nine cited by the appraisers. It is less than half a mile from and on the same street as the Property. It is basically the same age and occupies a comparably sized lot. It sold in April 2017 for $550,000. Ms. Altsher adjusted its value downward to $486,730 to make it comparable to the Property for valuation purposes because the Property, among other things, had fewer rooms and was in worse condition.[2]

I do not find, however, that Mr. Altsher's comparability adjustments went far enough. I find that in her valuation she unjustifiably minimized the negative effect that the condition of the Property's family room had on its value. I find that the family room had lost its ceiling and part of the interior finish of one wall. Ms. Altsher adjusted for this condition with a $5000 deduction in value, using a purely mathematical formula based on $45 per square foot to replace the ceiling and wall. I find that the negative impact on a prospective purchaser viewing the Property, getting to the family room and seeing old and exposed ceiling beams and loose wiring dangling above and an unfinished wall at one end, would reasonably translate into a price deduction far greater than $5000.

In her appraisal, Ms. Altsher gave the Property a condition rating of "C4", defined in the appraisal report as featuring some deferred maintenance and deterioration due to normal wear and tear. She gave the comparable property down the street a "C3" rating, defined as well

---

[2] At the hearing, the Craigs attempted to undermine Ms. Altsher's valuation assumptions by noting that she had failed to consider the Property's close proximity to Interstate 95, a major and perpetually congested highway. They neglected, however, to introduce any evidence as to just how the Property's value would be affected by this fact. Their own appraiser, Mr. McDonough, did not take the proximity to the highway into account either in his appraisal or his testimony.

5

maintained with limited physical deterioration. I find that based on the condition of the family room, the Property should have been rated C5 as reflecting obvious deferred maintenance and the need for significant repairs. I find that rather than a $5000 downward adjustment in value, the appraisal should have applied a $27,000 downward adjustment (or $22,000 over the $5000 already taken) which would have brought the value of the comparable property down the street to $464,750 and similarly reduced the value of the other comparable properties cited.

Factoring in an additional downward adjustment in value of $22,000 to accurately take into account the condition of the Property's family room, I find that the fair market value of the Property for plan confirmation purposes is $465,000. Because this value exceeds Ditech's secured claim, the Craig's chapter 13 plan must treat Webster Bank's claim as fully secured. *Nobelman*, 508 U.S. at 334. Accordingly, the objection of Webster Bank to the plan is SUSTAINED. The Craigs are ordered to file an amended plan consistent with my determination of value within 30 days.

At Boston, Massachusetts this 30th day of April, 2018.

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:   Joseph P. Foley, Esq.
Boston, MA
for debtors, James E. Craig and Kelly A. Sullivan-Craig

Simon J. Brighenti, Jr., Esq.
O'Connell, Attmore & Morris, LLC
West Springfield, MA
for Webster Bank, N.A.